*In Re: Criminal Investigation No. CID 18-2673 in the Circuit Court for Baltimore City*, Nos. 4, 5, & 6, September Term 2025. Opinion by Biran, J.

**MARYLAND CONSTITUTION – ARTICLE V, § 3 – ATTORNEY GENERAL'S INVESTIGATORY AUTHORITY – GOVERNOR'S AUTHORITY TO DIRECT INVESTIGATIONS** – Article V, § 3(a)(2) of the Constitution of Maryland permits the Attorney General to "[i]nvestigate, commence, and prosecute or defend any civil or criminal suit or action or category of such suits or actions … which the General Assembly by law or joint resolution, or the Governor, shall have directed or shall direct to be investigated, commenced and prosecuted or defended." In 2015, the Governor of Maryland directed the Office of the Attorney General ("OAG") to investigate and prosecute "crimes of exploitation," including crimes involving abuse of children. The Supreme Court of Maryland held that the Governor did not exceed his authority under § 3(a)(2) in issuing this directive. The directive did not encroach on the authority of State's Attorneys. Section 3(a)(2) contemplates that State's Attorneys and OAG will have concurrent authority to prosecute categories of crimes, as directed by the General Assembly or the Governor. In addition, the Court held that when the Governor directs OAG to prosecute a category of crimes, the Governor does not violate Maryland's constitutional separation of powers by exercising legislative power. A § 3(a)(2) directive is an executive action when the Governor issues it.

**GRAND JURY – SECRECY – MARYLAND RULE 4-642(d) – DISCLOSURE – PARTICULARIZED NEED** – A circuit court may grant a motion for disclosure of grand jury material under Maryland Rule 4-642(d) if the moving party demonstrates a particularized need for disclosure. Petitioners are current and former clergy and staff of the Archdiocese of Baltimore and the Roman Catholic Archdiocese of Erie, Pennsylvania who have not been charged with any crimes. OAG sought a court order under Rule 4-642(d) to disclose Petitioners' identities for the purpose of holding them to public account in connection with alleged sexual abuse of children. The Supreme Court of Maryland held that the interest of public accountability does not give rise to a particularized need for disclosure of Petitioners' identities.

Circuit Court for Baltimore City
Case No: Misc. 1144
Argued: September 5, 2025

IN THE SUPREME COURT

OF MARYLAND

Nos. 4, 5, & 6

September Term, 2025

IN RE: CRIMINAL INVESTIGATION
NO. CID 18-2673 IN THE CIRCUIT
COURT FOR BALTIMORE CITY

Fader, C.J.
Booth
Biran
Gould
Eaves
Killough
McDonald, Robert N.
   (Senior Justice, Specially Assigned),

JJ.

Opinion by Biran, J.

Filed: April 27, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

Grand juries operate in secret. In the absence of an indictment, Maryland prosecutors generally may not disclose grand jury material without a court order. To obtain a court order, the moving party must demonstrate a particularized need for disclosure of grand jury material. The dispositive question in the present cases is whether a requestor may meet that burden by showing that the public's interest in learning negative information about uncharged individuals outweighs the need for continued secrecy of that information.

The Office of the Attorney General ("OAG"), the Respondent here, served two grand jury subpoenas for records on the Archdiocese of Baltimore ("AOB"). The subpoenas compelled AOB to produce records relating to allegations of child sexual abuse committed by clergy and other individuals affiliated with AOB, dating back to 1940. OAG claims it had authority to obtain and serve the grand jury subpoenas based on a letter issued by then-Governor Lawrence J. Hogan, Jr., directing OAG to investigate crimes of exploitation, including abuse of children. AOB produced hundreds of thousands of documents in response to the grand jury subpoenas. OAG did not summon any witnesses to the grand jury that issued the subpoenas, nor did the grand jury issue any indictments. However, that was not the end of the matter.

OAG drafted a document entitled "Attorney General's Report on Child Sexual Abuse in the Archdiocese of Baltimore" (the "Report"). The Report includes information that OAG learned from the records that AOB produced in response to the grand jury subpoenas. The Report focuses on more than 150 former and current AOB clergy and staff who allegedly (and, in many instances, indisputably) committed acts of child sexual abuse. One of the Petitioners before us in these appeals is an alleged perpetrator of such abuse.

The Report also identifies clergy and laypeople who did not themselves abuse children. The Report alleges that some of these individuals concealed acts of abuse, did not do enough to stop the abuse, or otherwise engaged in problematic conduct in relation to such abuse. The remaining Petitioners are among this group of non-perpetrators. No Petitioner has ever been charged with any crime relating to the allegations in the Report.

OAG sought to make the Report public. Because the Report contains grand jury material, OAG moved for a court order to publish the Report. OAG contended that release of the Report was necessary to inform the public of the scale and scope of child sexual abuse within AOB and of the actions within the leadership of the Church to keep that abuse secret. Petitioners objected to the disclosure of their names and other identifying information in the Report on several grounds. First, they asserted that OAG lacked authority to conduct the investigation because Governor Hogan's directive was too broad and open-ended, intruding on State's Attorneys' constitutional role to investigate and prosecute crime. Second, they claimed that, even if OAG had authority to investigate AOB, it lacked authority to issue a public report about the investigation. Third, Petitioners argued that a circuit court may not order disclosure of grand jury material for the principal purpose of holding uncharged individuals to public account.

After conducting a hearing, the circuit court granted OAG's disclosure motion with respect to Petitioners. The court concluded that OAG had constitutional authority to conduct the investigation and to write a report about that investigation, and that the interest in public accountability warranted disclosure of Petitioners' identities.

Petitioners appealed to the Appellate Court of Maryland, which affirmed the circuit court's ruling in part. The Appellate Court held that OAG had authority to conduct the investigation and to write a report detailing the results of its investigation. The Appellate Court also rejected Petitioners' contention that Maryland law categorically prohibits the disclosure of grand jury material to achieve public accountability. However, the Appellate Court held that the circuit court erred by not considering OAG's disclosure motion with respect to each Petitioner individually. The Appellate Court directed a remand to the circuit court to conduct the required analyses. Petitioners sought further review in this Court.

We conclude that OAG had authority to investigate child sexual abuse allegedly committed by AOB clergy and staff. However, the circuit court should have denied OAG's motion to disclose Petitioners' identities. OAG proffered that the purpose of disclosure was public accountability. Many grand jury investigations obtain damaging information and allegations about uncharged individuals that the public might benefit from learning. One of the primary purposes of grand jury secrecy is to protect uncharged persons from public disgrace in the absence of a criminal charge and a forum in which to seek vindication. To overcome an objection to disclosure of otherwise secret information about an uncharged individual, a requestor must show that disclosure will serve an interest beyond the public's interest in learning the information. Because OAG did not meet that burden here, we reverse the judgment of the Appellate Court.[1]

_____

[1] As discussed below, Petitioners filed three petitions for *certiorari*. We granted the three petitions, and heard oral arguments in the three cases on the same day. Because the questions we decide are raised in all three cases, we choose to issue one opinion.

# I

# Background

## A. OAG's Investigation

*OAG's Letter Seeking Prosecutive Authority*

On March 25, 2015, Deputy Attorney General Thiruvendran Vignarajah sent a letter to Governor Hogan's Deputy Legal Counsel, Mark Crooks, requesting "a grant of authority to [OAG] to prosecute certain categories of crimes" (the "Vignarajah Letter" or the "Letter").[2] The Letter indicated that OAG had made similar requests for prosecutive authority to Governors Glendening, Ehrlich, and O'Malley during their administrations, and had received grants of authority from those Governors to investigate and prosecute various categories of crimes.

One of the categories covered in the Vignarajah Letter was "crimes of exploitation." The Letter stated that OAG's request regarding these crimes "consolidates previous requests for authority to prosecute computer crimes, financial abuse of vulnerable adults, and telemarketing fraud, and adds a request for authority to investigate and prosecute human trafficking, abuse and neglect of children, and child pornography." According to

---

[2] The Vignarajah Letter was not made part of the record in the circuit court. On December 1, 2025, in response to a suggestion at oral argument, OAG moved to supplement the record with the Vignarajah Letter. Sixteen of the Petitioners consented to OAG's motion to supplement the record; the remaining Petitioner did not respond to the motion. On December 18, 2025, we granted the motion to supplement the record. At the suggestion of the responding Petitioners, we directed the parties to file supplemental letter briefs addressing any issues raised by the Vignarajah Letter. The parties filed supplemental briefs and supplemental response briefs in January 2026.

the Letter, OAG's "request for broader authority reflects the ways in which children and vulnerable adults are targeted, trafficked, and terrorized."[3]

*Governor Hogan's Letter Directing OAG*
*to Investigate "Crimes of Exploitation"*

On April 24, 2015, Governor Hogan sent then-Attorney General Brian Frosh a letter authorizing and directing OAG, under Article V, § 3 of the Maryland Constitution, to "undertake investigations and prosecutions" into certain "crimes of exploitation,"[4] including but not limited to, "crimes involving child abuse" (the "Hogan Directive").[5] The Hogan Directive authorized OAG, in conjunction with its investigation of these crimes of

---

[3] The other categories of crimes covered in the Vignarajah Letter were organized crime, natural resources crime, illegal dumping, tax fraud, securities crime, Medicaid fraud, health care fraud, insurance fraud, and procurement fraud/state employee misconduct. In addition, OAG asked for authority to accept case referrals from State's Attorneys, the State Prosecutor, and the United States Attorney. According to the Letter, Governor Hogan's predecessor, Governor Martin O'Malley, had granted authority to OAG to prosecute all categories of crimes referenced in the Letter, and to accept case referrals from the other prosecutors. OAG explained that, by way of the Vignarajah Letter, it was seeking to expand its authority in two of those categories. As discussed above, crimes of exploitation was one of the categories for which OAG was seeking expanded authority, including the authority to prosecute crimes involving the abuse of children.

[4] As discussed above, the Vignarajah Letter requested prosecutive authority regarding several categories of crimes. In granting OAG's request for authority to prosecute crimes of exploitation, Governor Hogan provided OAG with a letter specific to that part of the Vignarajah Letter. The record does not reflect whether Governor Hogan sent other category-specific authorization letters to OAG in response to the Vignarajah Letter.

[5] The other crimes referenced in the Hogan Directive were child neglect, abuse and neglect of vulnerable adults, financial exploitation of a vulnerable adult, human trafficking, and child pornography, as well as a number of crimes committed "in furtherance" of crimes of exploitation, and "crimes that might be discovered or otherwise come to [OAG's] attention during [its] handling of any such matter."

exploitation, "to use all necessary subpoena powers, to present to an appropriate grand jury any evidence and testimony considered necessary to carry out this authorization and directive, and to act with the full powers, rights and privileges possessed by a State's Attorney."

*The Grand Jury Subpoenas*

According to OAG, based on the Hogan Directive, OAG opened a criminal investigation in 2018 into child sexual abuse and conspiracy to conceal child sexual abuse by AOB clergy and employees. Pertinent to the present appeals, OAG obtained two subpoenas for records from a grand jury sitting in Baltimore City (collectively, the "Subpoenas"). The Subpoenas compelled AOB to produce records pertaining to allegations of child sexual abuse dating back to 1940. AOB's compliance with the Subpoenas took several years to complete, and resulted in the production of hundreds of thousands of records.

OAG did not call any witnesses to the grand jury that issued the Subpoenas or to any successor grand jury, nor did any grand jury in Baltimore City return any indictments against anyone affiliated with AOB.[6] According to OAG, "most of the abusers and those who concealed their wrongdoing are dead and no longer subject to prosecution." Report at 2.

---

[6] OAG charged one person in the Circuit Court for Baltimore County with child sex abuse offenses in connection with its investigation of AOB. That individual is not mentioned in the Report. In June 2023, he was acquitted of all charges.

*The Report*

That being the case, OAG sought another way to "expos[e] the Archdiocese's transgressions to the fullest extent possible." *Id.* The 456-page Report, dated April 2023, includes information that OAG obtained by way of the Subpoenas.[7] According to OAG, its goal in releasing the Report is to "make public for the first time the enormous scope and scale of abuse and concealment perpetrated by the Archdiocese of Baltimore." *Id.*; *see also id.* ("This report seeks to document this long and sordid history."). The Report states that, "[w]hile it may be too late for the victims to see criminal justice served," OAG hopes that full disclosure of AOB's misconduct "will bring some measure of accountability." *Id.*

The Report begins with a "List of Abusers" – 156 priests and other individuals affiliated with AOB – whose alleged (and in some cases, proven) acts of abuse are detailed in case descriptions later in the Report. *Id.* at iii–vi.[8] After providing additional background information, the Report sets forth a "Summary of [AOB's] Abuse and Cover Up." *Id.* at 9. The summary begins:

> As the case descriptions in this Report make clear, from the 1940s through 2002, over a hundred priests and other Archdiocese personnel engaged in horrific and repeated abuse of the most vulnerable children in their communities while Archdiocese leadership looked the other way. Time and again, members of the Church's hierarchy resolutely refused to acknowledge allegations of child sexual abuse for as long as possible. When denial became impossible, Church leadership would remove abusers from the parish or school, sometimes with promises that they would have no further contact with children. Church documents reveal with disturbing clarity that the

---

[7] OAG does not dispute that the specific information at issue in these appeals – Petitioners' identities – is grand jury material.

[8] AOB had previously included 115 of these individuals in a publicly issued list of priests who, according to AOB, had been "credibly accused" of abuse.

Archdiocese was more concerned with avoiding scandal and negative publicity than it was with protecting children.

*Id.* The summary provides details about the people who held leadership positions in AOB throughout the period under investigation, and it specifies alleged acts and omissions of these leaders in response to reports of child sexual abuse. *Id.* at 13-19.

The Report then makes two recommendations: (1) the General Assembly should amend the statute of limitations for civil actions involving child sex abuse;[9] and (2) AOB should expand its list of credibly accused individuals beyond clergy. *Id.* at 19-20.

Most of the remaining 435 pages of the Report are comprised of 156 "abuser narratives" – one for each of the 156 people contained in the List of Abusers. Within these narratives, the Report names other individuals who were not accused of committing acts of abuse. The Report alleges that many of these individuals concealed abuse committed by others or otherwise engaged in conduct that allowed the scourge of child sexual abuse within AOB to continue.

### B. Proceedings in the Circuit Court

In November 2022, OAG filed a motion in the Circuit Court for Baltimore City seeking an order to disclose publicly the information in the Report that it had obtained by way of the Subpoenas. OAG told the court that it was unable to bring indictments of some

---

[9] The Report notes that, as of April 2023, "the General Assembly was poised to pass legislation … that, if signed by the Governor, would eliminate the State's civil statute of limitations for suits for damages for child sexual abuse." Report at 20. That legislation, the Child Victims Act of 2023 (the "CVA"), did become law. This Court subsequently upheld the CVA against constitutional challenge. *See Roman Cath. Archbishop of Wash. v. Doe*, 489 Md. 514 (2025).

8

of the individuals discussed in the Report due to their deaths, the expiration of statutes of limitations, and other impediments. Thus, OAG explained, the only way to inform the public of the scale and scope of child sexual abuse within AOB – and the actions that Church leaders took to keep that abuse secret – was to publish the Report.

The circuit court initially authorized OAG to release a redacted version of the Report. The court directed OAG to withhold more than 35 persons' identities in this version of the Report, so that these individuals could receive notice and an opportunity to respond to the motion to disclose. On April 5, 2023, OAG publicly released the redacted Report.

Thirty of the notified individuals, including the 17 Petitioners before us, objected to their inclusion in the Report. OAG then filed a "renewed" motion to disclose the objectors' identifying information. After holding a hearing, the circuit court authorized disclosure with respect to all but three of the individuals whose identities were initially redacted. The court found that "there is a particularized need to publish a report that is as transparent and open as possible," and that "the need for individualized accountability for both actions and inactions" outweighed Petitioners' interest in not having their identities revealed. The court stayed its order with respect to any affected individuals who noted an appeal.

## C. Appeals

Eighteen individuals challenged the circuit court's disclosure order in four separate appeals during the Appellate Court's September 2023 Term. None of these persons has ever been charged with a crime relating to the allegations in the Report.

Fourteen current and former members of AOB's clergy were the Appellants in Appeal No. 1846. *See In re Crim. Investigation No. CID 18-2673 in the Cir. Ct. for Balt.*

9

*City*, No. 1846, Sept. Term, 2023 (Md. App. Ct. Oct. 23, 2024) ("*In re Crim. Investigation, No. 1846*"). Of this group, five are or were senior AOB personnel who received reports of abuse, while the other nine are or were lower-level clergy included in the Report due to their interactions with alleged abusers and/or victims. None of these individuals is alleged to have committed any acts of abuse.

A former non-clergy employee of AOB was the sole Appellant in Appeal No. 1847. *See In re Crim. Investigation No. CID 18-2673 in the Cir. Ct. for Balt. City*, No. 1847, Sept. Term, 2023 (Md. App. Ct. Oct. 23, 2024) ("*In re Crim. Investigation, No. 1847*"). This individual is not alleged to be an abuser.

A former non-clergy employee of AOB was the sole Appellant in Appeal No. 1848. *See In re Crim. Investigation No. CID 18-2673 in the Cir. Ct. for Balt. City*, No. 1848, Sept. Term, 2023 (Md. App. Ct. Oct. 23, 2024) ("*In re Crim. Investigation, No. 1848*"). The Report alleges that this individual committed acts of abuse.

Two priests within the Roman Catholic Archdiocese of Erie, Pennsylvania (the "Erie Diocese") were the Appellants in Appeal No. 1849. *See In re Crim. Investigation No. CID 18-2673 in the Cir. Ct. for Balt. City*, No. 1849, Sept. Term, 2023 (Md. App. Ct. Oct. 23, 2024) ("*In re Crim. Investigation, No. 1849*"). These individuals were not accused of sexual abuse, nor were they ever AOB clergy or staff. OAG included these priests in the Report to detail their alleged involvement in AOB's effort to transfer an abusive priest to the Erie Diocese.

The Appellants collectively argued that: (1) OAG lacked constitutional authority to investigate AOB; (2) OAG lacked constitutional authority to write and issue the Report;

10

and (3) the circuit court erred in applying the balancing test set forth in *In re Criminal Investigation No. 437 in the Circuit Court for Baltimore City*, 316 Md. 66 (1989), in determining whether to order disclosure of their identities. In addition, each Appellant argued that the circuit court erred in finding that OAG established a particularized need for disclosure of their identity. Finally, the Erie Diocese Appellants asserted that OAG improperly exercised extraterritorial authority over them and violated their right to reputation under the Pennsylvania Constitution.

The Appellate Court held that OAG had authority to investigate AOB, based on the Hogan Directive. *E.g.*, *In re Crim. Investigation*, *No. 1846*, slip op. at 22-29. The court further opined that OAG's authority to write the Report detailing its investigation is implied in its authority to conduct that investigation. *E.g.*, *id.* at 2 n.2. In addition, the Appellate Court concluded that the circuit court properly invoked the *Criminal Investigation No. 437* balancing test in assessing whether to authorize disclosure of Appellants' identities. *E.g.*, *id.* at 34-37. The Appellate Court rejected the Erie Diocese Appellants' argument that OAG lacks extraterritorial authority to impose a "quasi-criminal punishment" on them. *In re Crim. Investigation, No. 1849*, slip op. at 38-39. The court also held that releasing the Erie Diocese Appellants' names in the Report does not violate their right to reputation under the Pennsylvania Constitution. *Id.* at 39-40.

However, the Appellate Court held that the circuit court abused its discretion by failing to conduct an individualized assessment of the need for disclosure with respect to each Appellant. *E.g.*, *In re Crim. Investigation*, *No. 1846*, slip op. at 43-46. The court vacated the circuit court's judgment and remanded with instructions for the circuit court to

11

individually analyze whether there is a particularized need to disclose each Appellant's identity. *E.g.*, *id.* at 46-47.

All Appellants filed petitions for certiorari, which we granted on March 21, 2025. The cases were docketed as Nos. 4, 5, 6, and 7 of this Court's September 2025 Term. OAG and the Petitioner in No. 7 (the Appellant in *In re Crim. Investigation, No. 1847*) subsequently resolved that case, resulting in the voluntary dismissal of that appeal.

The remaining Petitioners present three common questions, which we have reordered and rephrased slightly:

1. Whether the Maryland Constitution authorizes the Governor to direct OAG to investigate and prosecute any "crimes of exploitation" for an unlimited time, and without accounting for the competing authority of the State's Attorneys and the General Assembly.

2. Whether this Court's creation in 1989 of a balancing test for release of secret grand jury information overruled its earlier authority categorically prohibiting a prosecutor from releasing information about uncharged individuals to hold them to public account.

3. Whether OAG has constitutional authority to publish a report based on secret grand jury information that intentionally identifies uncharged individuals for the purpose of holding them to public account.

In addition, in No. 6, the Erie Diocese Petitioners present a question specific to themselves:

4. Whether the Appellate Court erred by remanding the case to the circuit court to conduct an individualized analysis when the undisputed record establishes as a matter of law that there is no particularized need to disclose the Erie Diocese Petitioners' identities.

12

## II

### Standard of Review

An appellate court normally reviews a circuit court judge's decision regarding disclosure of grand jury information for abuse of discretion. *See Crim. Investigation No. 437*, 316 Md. at 101. However, to resolve these appeals, we must decide questions of law. Thus, our review is *de novo*. *See, e.g.*, *In re Special Investigation Misc. 1064*, 478 Md. 528, 545 (2021).

## III

### Discussion

#### A. OAG's Authority to Investigate AOB

Petitioners argue that OAG lacked authority to investigate child sexual abuse within AOB. They contend that, in directing OAG broadly to investigate "crimes of exploitation," Governor Hogan exceeded his authority under Article V, § 3(a)(2) of the Maryland Constitution to direct OAG to investigate and/or prosecute a "category" of criminal cases. In addition, Petitioners assert that the Hogan Directive encroaches on the State's Attorneys' constitutional authority to prosecute criminal cases. Finally, Petitioners contend that the Hogan Directive violates Maryland's constitutional separation of powers.

In response, OAG argues that the Governor has express constitutional authority to direct OAG to investigate categories of crimes, notwithstanding that such directives may effectively provide OAG and State's Attorneys with concurrent prosecutive authority over such crimes. Furthermore, OAG maintains that Governor Hogan properly exercised

executive authority by directing OAG to investigate crimes of exploitation, including crimes involving abuse of children. We agree with OAG on this issue.

OAG's powers are limited to those vested in the Attorney General by the Maryland Constitution and the enactments of the General Assembly. *State ex rel. Att'y Gen. v. Burning Tree Club, Inc.*, 301 Md. 9, 32 (1984). Article V, § 3(a)(2) of the Constitution grants the Attorney General authority to:

> [i]nvestigate, commence, and prosecute or defend *any civil or criminal suit or action or category of such suits or actions* … on the part of the State or in which the State may be interested, which the General Assembly by law or joint resolution, or the Governor, shall have directed or shall direct to be investigated, commenced and prosecuted or defended.

(Emphasis added). Section 3(a)(2) does not expressly place any limitations on the categories of crimes the Attorney General may investigate and prosecute. It also contains no limitations on how the Governor may define a particular category of crimes or on the length of time such a directive may be in force. The Hogan Directive authorized OAG to investigate and prosecute "crimes of exploitation," including "crimes involving child abuse." Thus, the Hogan Directive encompassed an investigation of child sexual abuse allegedly committed by clergy and others affiliated with AOB.

Petitioners argue that Governor Hogan exceeded his authority under § 3(a)(2) by granting OAG such a broad mandate. They contend that the word "category" in § 3(a)(2) must be read narrowly to mean a discrete set of factually related matters. Thus, according to Petitioners, while Governor Hogan may have had authority to direct OAG to investigate particular alleged acts of child abuse, he did not have authority to direct OAG to investigate

14

all "crimes of exploitation" or all crimes involving abuse of children in Maryland. We disagree.

Prior to 1976, Article V, § 3 provided that the Attorney General "shall commence and prosecute or defend any suit or action in any of said Courts, on the part of the State, which the General Assembly, or the Governor, acting according to law, shall direct to be commenced, prosecuted or defended[.]" *See* 1976 Md. Laws 1436-37, Ch. 545 § 1. If this version of § 3 had been in effect in 2015, Governor Hogan likely would not have had the power to direct OAG to investigate and prosecute all crimes involving child abuse, let alone all crimes of exploitation. However, as Petitioners acknowledge, the 1976 amendment to § 3 broadened the General Assembly's and the Governor's power to direct OAG in two respects: it added "investigate" to the existing verbal phrase ("commence and prosecute or defend"), and added "category of such [criminal or civil] suits or actions" to the existing direct objects ("any suit or action," which was also updated to include civil matters).

Petitioners argue that these amendments to § 3 must be read in light of the historical autonomy of Maryland's State's Attorneys and corresponding limitations on the powers of the Attorney General. *See, e.g.*, MD. CONST. (1851) art. XXXII (abolishing the Attorney General's office in favor of elected State's Attorneys); 1862 Md. Laws 197, Ch. 177 (establishing that State's Attorneys represent the State in prosecutions and defenses in which the State is interested). Petitioners point to *Murphy v. Yates*, 276 Md. 475 (1975), in which this Court declared a statute unconstitutional for giving an appointed Special Prosecutor the power to prosecute certain offenses. This was a "clear invasion of the State's Attorney's most awesome discretionary power: to determine whether or not to prosecute."

15

*Id.* at 495. Notably, the Court stated that if the General Assembly wished to create a State Prosecutor with authority that was concurrent with that of State's Attorneys, a constitutional amendment would be necessary. *Id.*

The General Assembly responded to *Murphy* by passing legislation in 1976 that led to two constitutional amendments, one of which was the 1976 amendment to § 3 that allows the General Assembly and the Governor to direct OAG to investigate and prosecute any "category" of crimes.[10] Petitioners assert that both proposed constitutional amendments were part of a legislative strategy to create a Special Prosecutor in the aftermath of *Murphy*. *See* Richard Ben Cramer*, Crime law advances: Prosecutor plan approved by Senate*, BALT. SUN, Mar. 16, 1976, at C1. Whether or not that was the case, the amendment to § 3 addressed the powers of the Attorney General, not a Special Prosecutor. And the amendment expressly authorized the General Assembly and the Governor to direct the Attorney General to prosecute any "category" of criminal offenses. Thus, contrary to Petitioners' contention, the plain language of § 3(a)(2) reflects an intent to allow the General Assembly and the Governor to direct OAG to prosecute significantly more crimes than had been the case before the 1976 amendment.

The dictionary definition of "category" includes "any of several fundamental and distinct classes to which entities or concepts belong" and "a division within a system of classification." *Category*, MERRIAM-WEBSTER ONLINE DICTIONARY, available at

---

[10] The other amendment modified the State's Attorneys' duties from those "prescribed by law" to those "prescribed by the General Assembly." 1976 Md. Laws 1438, Ch. 545 § 4 (amending MD. CONST. art. V, § 9).

16

https://perma.cc/EX48-K2RK. Crimes of exploitation and crimes involving child abuse both qualify as categories of crimes under these definitions, as they are distinct classes of crimes made up of individual offenses that share similar qualities or elements.[11] Thus, on its face, § 3(a)(2) gave Governor Hogan the authority to direct OAG to investigate both crimes involving child abuse and, more broadly, crimes of exploitation.

Contrary to Petitioners' contention, our interpretation of § 3(a)(2) does not encroach on State's Attorneys' authority. It does not take prosecutive authority over any criminal cases from State's Attorneys and vest that authority exclusively in the Attorney General. Rather, § 3(a)(2) contemplates that State's Attorneys and OAG will have concurrent authority to prosecute categories of crimes, as directed by the General Assembly or the Governor. As *Murphy* anticipated, this arrangement raises no constitutional issue concerning the powers of State's Attorneys, because § 3(a)(2) is part of the Maryland Constitution itself. *See Murphy*, 276 Md. at 495; *see also In re Special Investigation No. 244*, 296 Md. 80, 87-88 (1983) (rejecting assertion that overlap with State's Attorney's powers prevented OAG from having authority to conduct an investigation that the Governor directed); *In re Special Investigation No. 281*, 299 Md. 181, 199-200 (1984) (rejecting argument that only the State's Attorney may petition a circuit court to continue

---

[11] As discussed above, § 3(a)(2) does not expressly constrain the General Assembly or the Governor in choosing how to define a particular category of crimes. In this case, we need not consider the outer limits of what constitutes a "category" under § 3(a)(2).

17

a grand jury's term, where OAG made such a request based on its authority under a § 3(a)(2) gubernatorial directive).[12]

For the same reason, we disagree with Petitioners' contention that Governor Hogan improperly exercised legislative authority by directing OAG to investigate and prosecute crimes of exploitation, including child abuse crimes. In authorizing both the General Assembly and the Governor to direct OAG to prosecute categories of crimes, § 3(a)(2) creates an area of overlap of governmental power between the legislative and executive branches. When the Governor directs OAG to prosecute a category of crimes, the Governor does not violate Maryland's constitutional separation of powers by exercising legislative power. A § 3(a)(2) directive is an executive action when the Governor issues it.[13]

---

[12] The Vignarajah Letter reflects that, upon OAG's request, several recent Governors have granted OAG prosecutive authority over multiple broad categories of crimes. The record does not reveal whether those Governors informed the General Assembly or the State's Attorneys of the extent of their § 3(a)(2) directives. If the General Assembly believes that § 3(a)(2) strikes an improper balance of power between the General Assembly and the Governor, or allows the General Assembly and the Governor to infringe on the prerogatives of State's Attorneys in ways that are undesirable, it may initiate further amendments to § 3(a)(2).

[13] At oral argument, OAG argued that gubernatorial directives to OAG continue in perpetuity unless rescinded. As the directive here was issued by the Governor and to the Attorney General who were in place when the investigation occurred, we do not need to resolve that issue in this case and do not offer any opinion on it. Nonetheless, it may behoove incoming Governors expressly to rescind prior OAG directives at the outset of their terms and to issue new directives as they deem necessary. The Vignarajah Letter suggests that OAG historically may have treated a new Governor's directives as effectively rescinding the previous Governor's directives, at least to the extent the new Governor declined to provide authority to OAG over a category of criminal or civil cases that the previous Governor had granted to OAG. An express statement of rescission seemingly would eliminate any potential confusion about the continuing viability of a former Governor's directive.

In sum, Governor Hogan was constitutionally authorized to direct OAG to investigate and prosecute crimes of exploitation, including but not limited to, crimes involving abuse of children. Under the Hogan Directive, OAG had authority to investigate allegations of child sexual abuse within AOB.

## B. Disclosure of Grand Jury Material

Petitioners argue that the circuit court may not order disclosure of grand jury material for the purpose of holding them to public account. They rely on *In re Report of Grand Jury*, 152 Md. 616 (1927), in which this Court prohibited disclosure of grand jury information that would tend to accuse unindicted individuals of misconduct. In contrast, OAG maintains that this Court's decision in *Criminal Investigation No. 437* abrogated the categorical rule of *In re Report of Grand Jury* by establishing a balancing test for circuit courts to apply in considering requests for disclosure of grand jury material. OAG also claims that *In re Report of Grand Jury* is distinguishable from this case on its facts, and that the circumstances of this case demonstrate that a categorical rule barring disclosure for the purpose of public accountability is ill-advised.

We agree with Petitioners that *Criminal Investigation No. 437*'s balancing test has no application here. The interest of public accountability does not give rise to a particularized need for disclosure of grand jury material sufficient to overcome an uncharged person's objection to disclosure.[14]

---

[14] Because we hold that the circuit court may not order disclosure of the grand jury information at issue here as to all Petitioners, we need not decide the question that bears only on the Erie Diocese Petitioners. For the same reason, we will not reach the third

19

1. Grand Jury Secrecy

   *a. Historical Foundations*

At its inception in England in the twelfth century, the grand jury (then called the Grand Assize) did not operate in secret. Rather, "its deliberations were open to the public, and it functioned solely in the interest of the Crown." Richard M. Calkins, *Grand Jury Secrecy*, 63 Mich. L. Rev. 455, 456 (1965) ("Calkins"); *see also Crim. Investigation No. 437*, 316 Md. at 71 (discussing the Grand Assize). In the fourteenth century, a new group emerged as the accusatory body in England, "*le graunde inquest*." Calkins at 457. The

---

question presented by all Petitioners, i.e., whether OAG lacked constitutional authority to write and publish the Report. However, we note that, separate and apart from any constitutional constraints on OAG, the Rules of Professional Conduct restrict all prosecutors' extrajudicial statements in matters that go beyond grand jury proceedings. *See* Md. Rule 19-303.8(e) (providing that the prosecutor in a criminal case shall generally "refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused"); Md. Rule 19-303.6 (prohibiting extrajudicial statements that an attorney "knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding"). Similarly, a United States Department of Justice ("DOJ") policy generally prohibits federal prosecutors from naming unindicted coconspirators in charging documents. *See* U.S. Dep't of Just., Just. Manual § 9-11.130 (2018). And another DOJ policy states that "there is ordinarily no legitimate governmental purpose served by the government's public allegation of wrongdoing by an uncharged party[.]" *Id.* § 9-27.760 (2024) (internal quotation marks and citation omitted).

Petitioners objected to the disclosure of their own identities. We need not decide whether the circuit court erred in authorizing disclosure of other uncharged individuals' identities.

20

Grand Inquest "adopted the custom of hearing witnesses in private, thereby establishing some independence of action from the Crown." *Id.*

Scholars point to 1681 as a turning point in the history of grand jury secrecy. In that year, King Charles II sought to indict the Earl of Shaftesbury and another political opponent for treason through public grand jury proceedings. *Id.*; *see also* MARVIN E. FRANKEL & GARY P. NAFTALIS, THE GRAND JURY: AN INSTITUTION ON TRIAL 9 (1977) ("FRANKEL & NAFTALIS"). However, the grand juries resisted, reaffirming the practice of hearing evidence in private. Calkins at 457 & n.7; FRANKEL & NAFTALIS at 9. By insisting on closed proceedings, the jurors emphasized secrecy as a protective device for unindicted individuals. *See* Calkins at 457 (noting that, after the jurors declined to indict the Earl of Shaftesbury following their private deliberations, "[t]he case was thereafter celebrated as a bulwark against the oppression and despotism of the Crown").

The rule of grand jury secrecy "was imported into our federal common law and is an integral part of our criminal justice system." *Douglas Oil. Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 218 n.9 (1979). Although secrecy eventually came to be understood as furthering the grand jury's evidence-gathering role, the "common-law concept of secrecy that was imparted to American jurisprudence arose initially from a need to protect the grand jurors and private citizens from the oppression of the state." Calkins at 458.

b. *Fed. R. Crim. P. 6(e)*

Federal Rule of Criminal Procedure 6(e) codifies the federal common law requirement of grand jury secrecy. Rule 6(e) generally prohibits disclosure of grand jury matters by government attorneys, government personnel who assist government attorneys,

21

grand jurors, interpreters, court reporters, operators of recording devices, and transcribers of recorded testimony. *See* Fed. R. Crim. P. 6(e)(2)(B). In *Douglas Oil*, the Supreme Court summarized the reasons for maintaining grand jury secrecy as a default policy in Rule 6(e):

(1) To prevent the escape of those whose indictment may be contemplated;

(2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors;

(3) to prevent subornation of perjury or tampering with the witness[es] who may testify before the grand jury and later appear at the trial of those indicted by it;

(4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; and

(5) to protect [an] innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt.

*Id.* at 219 n.10 (citation modified). The first four of these purposes of secrecy protect the integrity of the grand jury investigation. The fifth protects uncharged individuals from "public ridicule." *Id.* at 219.

Rule 6(e) permits a court to authorize disclosure of a grand jury matter in several instances, including as pertinent for our purposes, "preliminarily to or in connection with a judicial proceeding[.]" Fed. R. Crim. P. 6(e)(3)(E)(i). In *Douglas Oil*, the Supreme Court held that parties requesting disclosure under this provision "must show that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed." 441 U.S. at 222. The Court described this test

22

as requiring the requestor to demonstrate that a "particularized need for disclosure outweigh[s] the interest in continued grand jury secrecy." *Id.* at 223.

### c. Grand Jury Secrecy in Maryland

#### i. In re Report of Grand Jury

As was the case federally, grand jury secrecy became a part of Maryland common law. In *In re Report of Grand Jury*, our predecessors held that grand juries may not report their findings outside of criminal indictments, to the extent such reports "condemn the acts and impugn the motives" of uncharged persons. 152 Md. at 632. The Court explained:

> At common law the function of the grand jury is confined to investigations of violations of the criminal law, and unless such investigations disclose facts which would constitute a recognized violation of the criminal law, they have no power or authority to criticize any particular individual or number of individuals. If the evidence obtained through their investigations warrants a presentment or indictment, under the law and the oath which they are required to take, they are bound to present or indict, and if in their judgment it falls short of showing the commission of a criminal offense, they are bound to refrain from making public the results of their investigation.

*Id.* at 623. In that case, after investigating the construction of a Baltimore City high school, the grand jury did not return any indictments. *See id.* at 617. However, the grand jury delivered a report to the court in which it criticized the City's construction methods and choice of materials and complained about the "inefficiency" of H.G. Perring, the supervising engineer of the City's Public Improvement Commission. *Id.* Mr. Perring, along with the Mayor and other City officials, filed petitions in the Criminal Court of Baltimore City to strike the grand jury's report from the records of the court. *Id.* at 619.

At the time, by statute, the grand jury of Baltimore City was required at each term of court to report to the court on the conditions of the City jail. *See id.* at 623. In addition,

23

it had long been the practice in Maryland for grand juries, "upon asking for their discharge, to make statements as to general conditions within their jurisdiction." *Id.* This Court observed that "[s]uch reports may have salutary effect and should be permitted so long as they do not point out individuals as subjects of public criticism and opprobrium." *Id.*

The report at issue before the Court fell on the wrong side of this line. It was "a censure of the conduct of persons engaged in the public business, impugning their integrity and fairness, and pointing them out as public servants whose official acts should merit condemnation at the hands of the people." *Id.* at 631. Making such a report therefore exceeded the grand jury's power. *Id.* The Court explained: "It is apparent that this should be so, for the protection of the good name and reputation of the people, otherwise a condition would exist which the establishment and zealous maintenance of the grand jury was intended to prevent, namely, that of having an individual publicly charged with misconduct without probable cause." *Id.* The Court therefore ordered the report stricken in its entirety. *Id.* at 632; *see also Coblentz v. State*, 164 Md. 558, 567 (1933) (grand jury proceedings must be secret, in part, to ensure that "individuals whose conduct may be investigated, but against whom no indictment may be found, are to be protected from disrepute"); *In re Rep. of Grand Jury of Carroll Cnty.*, 39 Md. App. 472, 477 (1978) (report of grand jury that disclosed alleged misconduct of uncharged Board of Education official contravened the rule set forth in *In re Report of Grand Jury*).

ii. *Codification of Grand Jury Secrecy*

The General Assembly first codified a requirement of grand jury secrecy in 1955. *See* 1955 Md. Laws 188-89, Ch. 130. That statute applied to the "stenographers" who

24

transcribed grand jury testimony. *See* Md. Code Ann., Art. 26, §§ 40, 42 (1957) (requiring stenographers to take an oath of secrecy and providing criminal penalties for violation of the secrecy obligation). In 1974, the General Assembly added similar requirements for grand jurors. *See* 1974 Md. Laws 1724-25, Ch. 464.

Under current law, grand jurors, grand jury bailiffs, clerks, court reporters, and interpreters are required to take an oath not to disclose any grand jury materials. Md. Code, Cts. & Jud. Proc. ("CJP") § 8-415 (1973, 2020 Repl. Vol.). Another statute provides that "[a] person may not disclose any content of a grand jury proceeding." *Id.* § 8-507(a). A violation of this prohibition is a misdemeanor offense. *Id.* § 8-507(b). The statute does not prevent a grand jury from "submitting a report as required by law." *Id.* § 8-507(c)(1).[15] It also provides an exception for "[a]ny other governmental unit or person" that makes "a disclosure authorized by law." *Id.* § 8-507(c)(2).

### iii. *Maryland Rule 4-642(d)*

One such disclosure authorized by law is a disclosure per court order issued under Maryland Rule 4-642(d). This Court adopted Rule 4-642, Maryland's analog to Rule 6 of the Federal Rules of Criminal Procedure, in 1984. Rule 4-642(d) provides:

> Unless disclosure of matters occurring before the grand jury is permitted by law without court authorization, a motion for disclosure of such matters shall

---

[15] By statute, a Baltimore City grand jury is required to submit a report "on each of its investigations and recommendations" at the end of the period for which it sits. CJP § 8-417(c). In addition, as was the case a century ago, Maryland grand juries today "may be asked to tour local correctional facilities and other locations and to report on operations and conditions at those facilities," and "may be asked to submit a report that summarizes the grand jury's activities and recommends improvements to the criminal justice system." Md. Judiciary, *Serving on a Maryland Grand Jury*, available at https://perma.cc/94B2-W2DC.

25

be filed in the circuit court where the grand jury convened. If the moving party is a State's Attorney who is seeking disclosure for enforcement of the criminal law of a state or the criminal law of the United States, the hearing shall be ex parte. In all other cases, the moving party shall serve a copy of the motion upon the State's Attorney, the parties to the judicial proceeding if disclosure is sought in connection with such a proceeding, and such other persons as the court may direct. The court shall conduct a hearing if requested within 15 days after service of the motion.

In drafting what became Rule 4-642(d), the Rules Committee intended "to a large extent [to] follow[] the language of Fed. R. Crim. P. 6(e) regarding non-disclosure and the exceptions to non-disclosure." Standing Comm. on Rules of Prac. & Proc., Meeting Minutes, at 15 (Oct. 15 & 16, 1982); *see also Crim. Investigation No. 437*, 316 Md. at 81 ("It is apparent that the federal disclosure rule and the Maryland disclosure rule are cut from the same cloth."). One difference, however, between Rule 6(e) and Rule 4-642(d) is that the federal rule authorizes disclosure to someone other than the government or a criminal defendant only if the disclosure is "preliminar[y] to or in connection with a judicial proceeding[.]" Fed. R. Crim. P. 6(e)(3)(E)(i). Rule 4-642(d) does not include such a limitation.

### iv.   Criminal Investigation No. 437

Five years after the adoption of Rule 4-642, in *Criminal Investigation No. 437*, this Court adopted a balancing test for circuit courts to use in analyzing a motion to disclose grand jury material under Rule 4-642. That case arose out of a grand jury investigation of a pharmacy. 316 Md. at 68-70. The grand jury returned no indictments. *Id.* at 69. OAG (as here, the governmental body that conducted the grand jury proceedings) subsequently filed a motion in circuit court for an order to disclose grand jury material to the federal

government. *Id.* at 70. OAG also asked for authority to include a transmittal letter with the records in which OAG summarized and described the records. *Id.* The purpose of the disclosure was to facilitate a potential effort by the federal government to seek civil sanctions. *See id.* After holding a hearing, the circuit court granted the State's motion. The pharmacy and one of its employees (collectively, the "Pharmacy") appealed. *Id.*

This Court emphasized that "[s]ecrecy is the lifeblood of the grand jury." *Id.* at 76; *see also id.* ("[T]he proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings." (quoting *Douglas Oil*, 441 U.S. at 218-19)). Thus, a circuit court evaluating a motion to disclose grand jury material "must always be reluctant to conclude that a breach of [grand jury] secrecy has been authorized." *Id.* at 81 (quoting *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 425 (1983)). While we acknowledged that "the veil of secrecy with which the grand jury is cloaked must be lifted at times in the interest of justice[,]" we simultaneously emphasized that "this may be done only discretely and limitedly." *Id.* We observed that, before the adoption of Rule 4-642, we had "followed the lead" of the U.S. Supreme Court and had "made the particularized need requirement for disclosure a part of the case law of this State." *Id.* at 83.

We then endorsed the particularized need standard in deciding motions for disclosure of grand jury material under Rule 4-642. *Id.* at 83 & n.10. Adapting *Douglas*

*Oil*'s test to Rule 4-642(d),[16] we held that to obtain an order to disclose grand jury materials in Maryland, the moving party must show that:

> 1) the material they seek is needed to avoid a possible injustice; and
>
> 2) the need for disclosure is greater than the need for continued secrecy; and
>
> 3) their request is structured to cover only material so needed.

*Id.* at 85, 100.

We also listed seven non-exclusive considerations that a circuit court may balance when weighing a motion for disclosure, including:

> 1) the need to protect the unindicted individual from disclosure;
>
> 2) the grand jury has concluded its operations;
>
> 3) the particularized need requirement applies to civil governmental agencies as well as to private parties;
>
> 4) the materials sought for disclosure are rationally related to the civil proceedings contemplated;
>
> 5) the materials sought may be available through ordinary discovery or other routine avenues of investigation;
>
> 6) disclosure will save time and expense; [and]
>
> 7) no indictments were returned as a result of the grand jury's investigation.

*Id.* at 100-01. We stated that "[n]one of these considerations, in itself, is usually sufficient to show that there is or is not a particularized need for disclosure." Instead, the weight given to each factor depends on the particular circumstances. *Id.* at 101.

---

[16] We recognized that an adaptation was necessary because the *Douglas Oil* test referenced Rule 6(e)'s judicial proceeding requirement. As discussed above, Rule 4-642(d) does not include the same limitation.

28

Having articulated the particularized need standard, we upheld the circuit court's disclosure order, finding no abuse of discretion. *Id.* at 103-06. We rejected the Pharmacy's contention that the State's disclosure motion was premature because the grand jury materials were not sought for use in connection with a judicial proceeding. *Id.* at 103-04. We reiterated that Rule 4-642, unlike Rule 6(e), does not require that the materials be sought for use in a judicial proceeding. *Id.*

We also rejected the Pharmacy's contention that, in making the referral to federal authorities, the State was effectively "accus[ing] [the Pharmacy's] professional employees of criminal conduct despite the absence of a grand jury indictment." *Id.* at 104. We acknowledged "the long-established rule" that "if a grand jury does not indict, it may not publicly criticize." *Id.* However, we concluded that the language contained in OAG's transmittal letter did not actually "brand … [the Pharmacy's] professional employees with criminal conduct." *Id.* at 105.

2. Public Accountability Cannot Justify Disclosure of Grand Jury Material Over the Objection of Uncharged Individuals.

OAG contends that the circuit court properly assessed its request to disclose Petitioners' identities under the balancing test this Court adopted in *Criminal Investigation No. 437*. We disagree. When a requestor's purpose in seeking disclosure of grand jury material is to publicize alleged misconduct by uncharged individuals who object to such disclosure, no balancing of interests is appropriate. Public accountability for such uncharged persons does not give rise to a particularized need for disclosure.

29

OAG told the circuit court and stated in the Report itself that its purpose in releasing the Report is to bring some measure of accountability and to document the "long and sordid history" of AOB clergy and staff supporting abusers and concealing abuse. However, OAG claims that it offered other justifications for disclosure of Petitioners' identities in addition to public accountability. For example, at oral argument OAG stated that release of the Report would help answer the questions, "How did this happen?" and "How can we make sure it doesn't happen again?" OAG proffered that identifying Petitioners' positions within the Church, which would effectively identify Petitioners themselves, was necessary for the public to understand how Petitioners "fit into the systematic concealment of child abuse" within AOB.

We disagree with OAG's assertion that it proffered a purpose for disclosure of Petitioners' identities that is materially different than holding Petitioners to public account. Public accountability and OAG's other stated justifications are different sides of the same coin. At bottom, OAG seeks to shine a light on Petitioners' alleged misconduct.

OAG has not cited, nor have we found, any case in a jurisdiction with a disclosure regime similar to Maryland's[17] that has approved the release of grand jury material for the

___

[17] Unlike Maryland, a minority of states have procedures in place for publication of grand jury reports that name uncharged individuals. But those jurisdictions typically provide safeguards to ensure fair treatment of uncharged individuals, as a matter of due process. *See* 3 WAYNE LAFAVE ET AL., CRIMINAL PROCEDURE § 8.3(h), at 40-41 (4th ed. 2015). For example, a Pennsylvania statute authorizes an investigating grand jury to submit a report to the supervising judge. 42 Pa. Cons. Stat. § 4552(a). If the supervising judge finds that the report is critical of an uncharged person, the judge may permit that person to submit a response to the allegations in the report. *Id.* § 4552(e). The supervising judge may then allow the response to be added to the report before the report is made part of the public

purpose of holding uncharged individuals to public account, over the objections of those individuals.[18] To be sure, under Rule 4-642(d), a court may order disclosure of grand jury material not only in connection with an already filed or contemplated judicial proceeding. But every case in which a Maryland court has found a particularized need for disclosure, both before and after the adoption of Rule 4-642, has involved the proposed use of grand jury material in connection with a particular legal proceeding or at least to determine whether a particular person or entity may be entitled to legal relief. For example, the disclosure in *Criminal Investigation No. 437* was not made to the public at large, but rather to a government agency for the purpose of allowing that agency to determine whether to seek available relief. *See also Martinez v. State*, 309 Md. 124, 142-43 (1987) (stating that

---

record. *Id.* Notably, the Pennsylvania Supreme Court determined that this and other potential remedies were insufficient to protect the right to reputation under the Pennsylvania Constitution of uncharged former and current priests who were condemned as "predator priests" in a grand jury report released in 2018. *See In re Fortieth Statewide Investigating Grand Jury*, 197 A.3d 712 (2018). The Court ordered the permanent redactions of these priests' names from the grand jury's report. *Id.* at 724.

[18] In the Second and Seventh Circuits, a federal district court may order disclosure of grand jury material in instances not strictly covered by Rule 6(e)(3)(E). *See In re Biaggi*, 478 F.2d 489, 494 (2d Cir. 1973) (affirming release of redacted grand jury transcripts based on the "special circumstances" of the case, i.e., the waiver of grand jury secrecy protection by Representative Biaggi, who had been the subject of the grand jury investigation); *Carlson v. United States*, 837 F.3d 753, 766-67 (7th Cir. 2016) (federal district court has inherent authority to unseal grand jury materials in circumstances not addressed by Rule 6(e)(3)(E)). That was also the case previously in the Eleventh Circuit, *see In re Petition to Inspect & Copy Grand Jury Materials ("Appeal of Hastings")*, 735 F.2d 1261, 1268-69 (11th Cir. 1984), although that Court no longer subscribes to that proposition. *See Pitch v. United States*, 953 F.3d 1226, 1229 (11th Cir. 2020) (en banc) (overruling *Appeal of Hastings*). We have not found any case in any of those circuits in which a court authorized disclosure of grand jury material for the purpose of holding uncharged individuals to public account, let alone over the objection of such individuals.

there is a particularized need in using grand jury materials for impeachment, refreshing a witness's recollection, and testing a witness's credibility, whether at trial or in a suppression hearing); *Jones v. State*, 297 Md. 7, 14-15 (1983) (holding that, after a State's witness testifies on direct examination, "a defendant is entitled to inspect the grand jury testimony for cross-examination purposes"); *In re Crim. Investigation No. 51,843 in the Cir. Ct. for Prince George's Cnty.*, 119 Md. App. 112, 115-17, 124-28 (1998) (affirming in part an order to disclose grand jury materials to former arrestees in civil rights cases they filed against the County and others).

Contrary to OAG's contention, we did not overrule or abrogate *In re Report of Grand Jury* in *Criminal Investigation No. 437*. To the contrary, we cited *In re Report of Grand Jury* favorably in that case for several propositions. *See Crim. Investigation No. 437*, 316 Md. at 71, 72, 72 n.4, 73. And we reaffirmed "the long-established rule … that if a grand jury does not indict, it may not publicly criticize." *Id.* at 104. We do not read *Criminal Investigation No. 437* to suggest that if OAG had requested an order to disclose damaging grand jury information about the Pharmacy in an OAG-authored report to be made available to the public, this Court would have endorsed the balancing of that interest against the need for continued secrecy. To our knowledge, such a request by a Maryland prosecutor in 1989 would have been unprecedented, just as OAG's request to disclose Petitioners' identities in this case is unprecedented. Thus, we are unsurprised that the Court in *Criminal Investigation No. 437* did not include dicta explaining that the balancing test it was adopting would have no application to such a scenario.

32

This case presents that scenario. We hold that the balancing test this Court adopted in *Criminal Investigation No. 437* has no application where the purpose of the requestor in seeking disclosure is to publicize negative information about uncharged individuals who object to such disclosure. Put another way, the "injustice" sought to be avoided through the disclosure of grand jury material, *see Crim. Investigation No. 437*, 316 Md. at 100, cannot be the inability of the public to hold uncharged individuals accountable for their conduct, at least where those individuals object to such disclosure. Many grand jury investigations produce negative information about uncharged individuals that the public might benefit from learning. That commonly present interest is insufficient to constitute a particularized need that may outweigh the continued interest in secrecy, where an uncharged person objects to disclosure.

OAG's arguments to the contrary are unpersuasive. To the extent OAG contends that the intensity of public interest in the conduct of uncharged individuals is a factor that a circuit court should be able to balance against the need to protect uncharged individuals from reputational harm, we disagree. The interests promoted by grand jury secrecy do not increase or decrease based on how much the public wants to learn the information contained in grand jury materials.[19]

---

[19] *See, e.g.*, Order Denying Petition to Unseal Grand Jury Transcripts, *In Re: Grand Jury 05-02 (WPB) & 07-103 (WPB)*, No. 25-mc-80920-RLR, 2025 WL 2076030, at *1 (S.D. Fla. July 23, 2025) (denying United States' request to unseal transcripts of testimony taken in 2005 and 2007 grand jury investigations of Jeffrey Epstein, where the government sought disclosure because "[p]ublic officials, lawmakers, pundits, and ordinary citizens remain deeply interested and concerned about the Epstein matter," including as to whether there was predication for an investigation into uncharged third parties).

We also disagree that *In re Report of Grand Jury* is distinguishable because it involved a report made by the grand jury itself, as opposed to a report made by another entity such as OAG. According to OAG, the decision in *In re Report of Grand Jury* "rested on the reputational consequences that can ensue when a person is condemned by the same body responsible for issuing an indictment." This distinction does not support OAG's position. Reputational harm to an uncharged person may well be more severe when criticism comes from the prosecutor that led a grand jury investigation than when it comes from the grand jury itself.

OAG also contends that a categorical rule against disclosure is inapt here because: (1) the Report contains only information gleaned from pre-existing documents, as opposed to grand jury testimony or deliberations; and (2) the grand jury has disbanded, eliminating any chance that disclosure would interfere with the grand jury's operations. We disagree. Although these factors are appropriate to consider where the moving party points to a particularized interest justifying disclosure, they do not move the needle where the requestor seeks to further the public's general interest in accountability, over the objection of an uncharged individual.

A contrary decision would be an unwise departure from centuries of grand jury practice that protects the rights of individuals. Petitioners were not charged with any crimes, yet OAG would publicly accuse them of illegal or inappropriate conduct without their having an opportunity to contest the allegations in a court of law. Should the circuit court on remand authorize disclosure, Petitioners would face the court of public opinion without any effective means of rebutting OAG's accusations. This would defeat one of the

main purposes of the grand jury process: preventing unindicted persons from being "held up to public ridicule." *Douglas Oil*, 441 U.S. at 219.

A contrary result also would undermine the efficacy of the grand jury as an investigative tool. The erosion of secrecy that OAG proposes would discourage cooperation in grand jury investigations. *See id.* ("[I]f preindictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony. Moreover, witnesses who appeared before the grand jury would be less likely to testify fully and frankly, as they would be open to retribution as well as to inducements."). It also would likely encourage the filing of motions to limit or quash grand jury subpoenas.

We do not minimize the harm that so many children suffered at the hands of clergy and others within AOB. Nor do we discount the interest of the public in understanding the history of child abuse in AOB and other institutions. Investigative journalism, criminal prosecutions, and civil actions have exposed much of what went on within AOB.

As stated above, *see* note 14, we do not decide whether the circuit court erred in authorizing OAG to disclose the identities of uncharged individuals who are not among the Petitioners before us. The Report in its redacted form is now a matter of public record. Thus, even if we were to conclude that no grand jury information should have been made public in the Report, we would not be able to provide a remedy to any uncharged person who was improperly identified.

That is not the case for Petitioners. They object to the disclosure of their names and identifying information for the purpose of holding them to public account. The rule of

grand jury secrecy prohibits that disclosure. For this reason, a remand to the circuit court to conduct an individualized analysis of the need to disclose each Petitioner's identity is inappropriate. OAG has offered only public accountability and other materially indistinguishable interests as justifying disclosure of all Petitioners' identities. That interest is insufficient to overcome each Petitioner's objection to disclosure. Accordingly, we reverse the judgments of the Appellate Court in all three appeals and direct remands to the circuit court for entry of an order denying OAG's motions to disclose with respect to Petitioners' identities.

## IV

## Conclusion

The Appellate Court correctly held that OAG had authority to investigate allegations of child sexual abuse in AOB, based on the Hogan Directive.

A court may not order disclosure of secret grand jury material, over the objection of an uncharged individual, for the purpose of holding that person accountable in the court of public opinion. The circuit court erred in granting OAG's request to disclose Petitioners' identities. The Appellate Court erred in ordering remands to the circuit court for additional analysis under Maryland Rule 4-642(d). We reverse the Appellate Court's judgments and direct remands to the circuit court for entry of an order denying OAG's motions to disclose Petitioners' identities.

**JUDGMENTS OF THE APPELLATE COURT OF MARYLAND REVERSED. CASES REMANDED TO THE APPELLATE COURT OF MARYLAND WITH THE INSTRUCTION THAT THEY**

36

**FURTHER BE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR ENTRY OF AN ORDER CONSISTENT WITH THIS OPINION. FIFTY PERCENT OF COSTS IN THE APPELLATE COURT OF MARYLAND AND THIS COURT TO BE PAID BY RESPONDENT AND FIFTY PERCENT OF SUCH COSTS TO BE DIVIDED EQUALLY AMONG PETITIONERS.**